UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BUDDY PROPERTIES, LLC,

    Plaintiff,

v.

SELECTIVE WAY INSURANCE
COMPANY,

    Defendant.

Case No. 24-10614
Honorable Laurie J. Michelson

**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [14]**

On March 29, 2022, a fire damaged part of a strip mall owned by Buddy Properties, LLC. Seeking to recover its losses, Buddy filed a claim with its insurance company, Selective Way Insurance. But the parties did not agree on how much money Selective owed Buddy. Buddy claims that the insurance policy it had with Selective covered not only the fire damage to affected units within the strip mall but also losses it suffered when tenants of units untouched by the fire withheld rent. Meanwhile, Selective argues that the insurance policy only covers those parts of the strip mall that were actually rendered untenantable by the fire. Because this Court agrees with Selective that Buddy cannot recover for its loss of rental proceeds from undamaged units, the Court GRANTS Selective's motion for partial summary judgement.

**I.**

Start with the undisputed facts. Buddy owns a strip mall located on Gratiot Avenue in Detroit, Michigan. (ECF No. 1, PageID.6.) The strip mall is comprised of

two buildings, with one building containing nine units (i.e., storefronts) and the other containing one unit. (ECF No. 18, PageID.418.) On March 29, 2022, there was a fire at Building 1 that physically damaged two of its nine rental units (units 15100 and 15096). (*Id.* at PageID.413–414.) Following the fire, the tenants of three other rental units that were not physically damaged by the fire (units 15080, 15072, and 15050) stopped paying rent. (*Id.* at PageID.414.) "Each tenant's stated reason for not paying rent was the strip mall's physical condition and appearance following the fire." (*Id.*)

At the time, both of Buddy's strip mall buildings were insured under a Policy issued by Selective. (*Id.* at PageID.413.) So on July 14, 2022, Buddy submitted a claim to Selective for (1) the cost to repair the building damage and (2) the money Buddy lost in "Rental Value," i.e., rental income.[1] (*Id.*) The first category of loss was not disputed, and on August 4, 2022, Selective paid Buddy the cost to repair Building 1. (ECF No. 18-2, PageID.439.) But Selective did not agree with Buddy's Rental Value calculation. Buddy sought to recover $77,005.07 in lost rental income attributable to five units—not only the two that suffered direct physical damage from the fire but also the three whose tenants stopped paying rent post-fire. (ECF No. 18, PageID.413;

---

[1] The Policy uses the term "Rental Value" to refer to the money the policyholder would have earned minus the expenses it would have incurred if not for the damage or loss at issue. Specifically, the Policy cites two categories of "Business Income" that constitute "Rental Value": (1) money that "would have been earned or incurred as rental income from tenant occupancy of the premises" (i.e., rental income) and (2) any "normal operating expenses incurred in connection with that premises" like "payroll." (*See* ECF No. 4, PageID.123 (cleaned up).) Because the policyholder here is a property owner, whose business is leasing property to store owners, "Rental Value" and "Business Income" all boil down to rental income. So these terms are used interchangeably in this opinion to refer to the same thing: the money Buddy would have earned as rental income from its tenants.

2

*see* ECF No. 18-3, PageID.441.) Selective paid Buddy $15,277.52 for the two rental units directly damaged by the fire (ECF No. 18-4, PageID.444), which it says is the proper Rental Value calculation.

Unsatisfied, Buddy sent a letter to Selective demanding appraisal pursuant to Michigan Compiled Laws § 500.2833(1)(m). (ECF No. 18-5, PageID.446); *see* Mich. Comp. Laws § 500.2833(1)(m) ("[I]f the insured and insurer fail to agree on the actual cash value or amount of the loss, either party may make a written demand that the amount of the loss or the actual cash value be set by appraisal."). According to Buddy, "[o]n March 1, 2024, [Selective] without giving an explanation informed [Buddy] it would not voluntarily participate in the [appraisal] demanded by [Buddy]." (ECF No. 1, PageID.7.)

So Buddy filed this action to compel appraisal. (ECF No. 1.) Buddy argued that § 500.28333(1)(m) mandates that if the insured and insurer do not agree on the amount of loss, "either party can make a written demand that the amount of loss be set by appraisal." (*Id.* at PageID.8–9 (citing *Frans v. Harleysville Lake States Ins. Co.*, 714 N.W.2d 671, 674 (Mich. Ct. App. 2006)).) On April 8, 2024, Selective answered confirming that "it formally rejected" Buddy's demand to go to appraisal (ECF No. 4, PageID.25) and outlining its affirmative defenses (*id.* at PageID.29–32).

On June 14, 2024, the Court conducted a scheduling conference with the parties. During that conference, Selective disputed that the Policy covered loss of rental income for units that were not directly damaged by the fire and advised that before appraisal could proceed the Court would need to decide the Policy's scope of

3

coverage. (Minute Entry, June 14, 2024); *see also Auto-Owners Ins. Co. v. Kwaiser*, 476 N.W.2d 467, 469–70 (Mich. Ct. App. 1991) ("Where the parties cannot agree on coverage, a court is to determine coverage in a declaratory action before an appraisal of the damage to the property."); *Smith v. State Farm Fire & Cas. Co.*, 737 F. Supp. 702, 711 (E.D. Mich. 2010) ("That coverage issues are for the court and not the appraisers is beyond dispute."). Accordingly, the Court requested that the parties "submit proposed orders pertaining to upcoming briefing on discussed coverage issues." (Minute Entry, June 14, 2024.) Shortly thereafter, the parties submitted, and the Court entered, a stipulation and order outlining a briefing schedule "on Selective's Motion to resolve the legal question of whether Buddy Properties can recover claimed business income loss for tenant spaces that did not suffer direct physical damages as a result of the . . . fire." (ECF No. 12, PageID.302.)

On August 5, 2024, pursuant to that briefing schedule, Selective filed a motion for partial summary judgment. (ECF No. 14.) It argues that Buddy "cannot recover claimed business income loss for tenant spaces that did not suffer direct physical damage as a result of the [f]ire." (*Id.* at PageID.348.) In response, Buddy argues that "because the Policy covers the buildings as the premises described in the Declarations and not the tenant spaces individually," and because "it is undisputed that direct physical loss from the fire rendered a part of [the buildings] untenantable, [Buddy] may recover the full amount of its Rental Value loss." (ECF No. 18, PageID.412 (cleaned up).)

4

## II.

Both parties agree that the central question for this Court to answer is whether Buddy can recover claimed business income loss for tenant spaces that did not suffer direct physical damage as a result of the fire. (*See* ECF No. 14, PageID.333; ECF No. 18, PageID.409.) Likewise, both parties agree that Michigan law governs the Court's interpretation of the Policy. *See, e.g.*, *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).

Michigan courts treat an insurance policy like any other contract. *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012). The Court "looks to the contract as a whole," *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997), to "effectuate the intent of the parties." *Health v. State Farm Mut. Auto. Ins. Co.*, 659 N.W.2d 698, 699 (Mich. Ct. App. 2002) (per curiam) (citing *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992)).

If a term is defined by the policy, then the policy's definition controls. *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193–94 (Mich. 1999). But if ambiguity remains under "a fair reading of the entire contract," Michigan law requires that the contract "be construed against its drafter and in favor of coverage." *Raska v. Farm Bureau Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982). "[T]his," however, "does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase . . . should be given some alien construction merely for the purpose of benefitting an insured." *Henderson*, 596 N.W.2d at 194. The proper interpretation of a contract is a question of law, as is the question of whether contract

5

language is ambiguous. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003).

Here, Selective moved for summary judgement. Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Here, there is no genuine dispute as to any material fact; the parties agree that their dispute is a legal one. So all that is left for the Court to determine is whether the proper interpretation of the Policy entitles Selective to judgment as a matter of law.

### III.

The Court begins, as it must, with the plain language of the Policy. First, the Policy's "Business Income and Extra Expense Coverage Form" contains a provision stating that Selective:

> [W]ill pay for the actual loss of Business Income [Buddy] sustain[s] due to the necessary "suspension" of [its] "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

6

(ECF No. 4, PageID.115.)[2]

The Policy goes on to define both "suspension" and "operations." "Suspension" means:

    a. The slowdown or cessation of your business activities; or

    b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

(*Id.* at PageID.123.) And "operations" means:

    a. Your business activities occurring at the described premises; and

    b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

(*Id.*)

In turn, the "Schedule of Locations" within the Policy's Declarations identifies the two strip mall buildings as the covered "premises." (*Id.* at Page ID.64–65.) One building contains nine individual tenant spaces, i.e., nine different businesses or storefronts, while the other contains just one.

**SCHEDULE OF LOCATIONS**

| Policy Effective Date: SEPTEMBER 1, 2021 | | | Schedule Effective Date: SEPTEMBER 1, 2021 | |
|---|---|---|---|---|
| Prem. No. | Location | | Bldg. No. | Occupancy |
| 1 | 15068-15100 Gratiot Ave DETROIT, MI 48205 | | 1 | LOC 1 |
| 2 | 15050 GRATIOT AVE DETROIT, MI 48205 | | 1 | LOC 2 |

(*See id.* at PageID.65.)

---

[2] The parties do not dispute that the March 29 fire qualifies as a "Covered Cause of Loss" under the Policy.

7

Selective argues that under the Policy, "coverage is only available for lost rents associated with tenant spaces that were rendered untenantable by direct physical damage to the property"—that is, spaces that were actually damaged by the fire. (ECF No. 14, PageID.342.) Buddy has a different interpretation. It highlights that the Policy defines suspension to include when "part or all of the described premises is rendered untenantable." (ECF No. 18, PageID.417 (quoting ECF No. 4, PageID.123).) And the Policy's Declarations define the "premises" as Building 1 and Building 2, not each of the individual rental units. (*Id.* at PageID.417–418 (citing ECF No. 4, PageID.65).) So, because *part* of the premises—two fire-damaged units in Building 1—were rendered untenantable, the Policy is triggered. And, argues Buddy, "there is no Policy language that unequivocally precludes [Buddy] from recovering its actual Rental Value loss" that was "directly or indirectly caused by the 'suspension' of its 'operations.'" (*Id.* at PageID.419.) So Buddy asserts it can recover not just the lost Rental Value from the two fire-damaged units, but also the losses it sustained when the tenants of three undamaged units withheld rent.

Selective is right. The Policy does not guarantee coverage for *any* suspension of operations caused by *any direct or indirect* harm to the premises. Rather, the Policy merely covers losses due to the "necessary 'suspension'" of operations caused by "direct physical . . . damage" to the premises. (ECF No. 4, PageID.115.) Under that language, the Policy covers only the losses from the two units damaged by fire. Those units suffered "direct physical . . . damage"—i.e., they were burned. And in those

8

units, operations were *necessarily* suspended—i.e., the fire rendered them necessarily untenantable.

By contrast, the language does not cover losses from the three units not damaged by fire. For one thing, those units suffered no "direct physical . . . damage." For another, the suspension of operations in those units was not *necessary*—indeed, as Selective points out, at least two of the three undamaged tenant spaces were occupied by tenants both before and after the fire. (*See* ECF No. 14, PageID.337; *see also* ECF No. 18-3, PageID.442 (Buddy's Rental Value claim summary).) In other words, Buddy suffered losses on those units because the tenants voluntarily chose to stop paying rent, not because a fire made suspension of operations an absolute necessity.

To be sure, Buddy is correct that the Policy does define suspension as when "part or all" of the premises is rendered untenable. (ECF No. 4, PageID.123.) And it is also correct to say that part of the premises—two units in Building 1—were indeed rendered untenantable. Where Buddy's argument goes astray is its assertion that "there is no Policy language that unequivocally precludes [Buddy] from recovering its actual Rental Value loss" that was "directly or indirectly caused by the suspension of its operations." (ECF No. 18, PageID.419.) Again, the Policy specifically limits business interruption coverage to "necessary" suspensions of operations "caused by direct physical . . . damage to property" on the premises. (ECF No. 4, PageID.115.) The two units damaged by fire meet those criteria; the remaining units do not.

9

Other courts analyzing similar language have reached similar results. And while none of these opinions are binding on this Court, they are nonetheless persuasive. For example, in *87 Uptown Road LLC v. Country Mutual Insurance Co.*, the plaintiff owned an apartment complex with eleven buildings. 207 N.Y.S.3d 241, 242 (N.Y. App. Div. 2024). A fire destroyed one of the buildings, "render[ing] [it] uninhabitable" and causing "superficial external damage to several other[s]." *Id.* at 242–43. The insurance policy covered the apartment's "actual loss of business income" sustained due to the "necessary suspension of [the apartment complex's] operations" and specified that the suspension "must be caused by direct physical loss of or damage to property at the described premises." *Id.* at 243 (cleaned up). The plaintiff owner argued that the policy's business income loss language extended coverage to include lost rents from "tenants of buildings that were not damaged by the fire, but nonetheless vacated due to the proximity of construction activity" following the fire. *Id.* at 244. The court disagreed, finding that a "material alteration or a complete and persistent dispossession of the insured property is required for reimbursement of loss of business income"; mere "inconvenience alone, absent direct damage" was not enough. *Id.* at 244–45.

So too here. As in *87 Uptown*, the insurance policy covers losses due to a necessary suspension of operations caused by direct physical damage. And the insured seeks compensation for unpaid rent from tenants who voluntarily left undamaged units. Thus, here, as in *87 Uptown*, coverage does not extend to the "lost rental income from [those] tenants." *Id.* at 245.

10

Likewise, in *Royal Indemnity Insurance Co. v. Mikob Properties, Inc.*, a fire destroyed one of three apartment buildings covered by an insurance policy. 940 F. Supp. 155, 155 (S.D. Tex. 1996). Following the fire, tenants of the two undamaged buildings were "unable to use the amenities" located near the damaged building and many moved out. *Id.* at 156. There, as here, the insurance policy covered the apartment's business income loss "due to the necessary suspension of [the apartment complex's] operations." *Id.* The plaintiff owner argued that the policy's coverage should extend to the "loss of rental income resulting from a reduction in tenant occupancy in buildings not physically damaged by or closed after the fire." *Id.* But the court rejected this argument, finding that the "decision by some tenants not to continue to rent" was not a *necessary* suspension under the policy. *Id.* at 158 (citing *Home Indem. Co. v. Hyplains Beef*, 893 F. Supp. 987, 991–93 (D. Kan. 1995)). Indeed, "the physical damage to part of the insured's premises did not cause a necessary suspension of operations or tenancy in the other, undamaged units." *Id.* at 159. And "[e]ven if the character of the apartment complex was adversely impacted by the fire, there was no 'necessary suspension of operations or tenancy'" in the undamaged buildings because those buildings were still able to operate. *Id.* at 160; *see also Keetch v. Mut. of Enumclaw Ins. Co.*, 831 P.2d 784, 786 (Wash. Ct. App. 1992) (finding that an insurance policy's business interruption clause did not cover decrease in a motel's occupancy following a volcanic eruption because the motel had the same number of habitable rooms both before and after the eruption).

11

Once again, the same principles control here. The "decision by some tenants not to continue to [pay] rent" for Buddy's three undamaged units does not qualify as a *necessary* suspension of operations in those units. *Royal Indem.*, 940 F. Supp. at 158. And "the physical damage" to the two burned units "did not cause a necessary suspension of operations or tenancy in the other, undamaged units." *Id.* at 159. The policy thus does not cover the losses from the unpaid rent on those units.

Buddy, like Selective, cites non-controlling cases in support of the result it seeks. (*See* ECF No. 18, PageID.420.) But Buddy's cases are distinguishable in important ways.

First, Buddy relies on *Aztar Corp. v. U.S. Fire Insurance Co.*, 224 P.3d 960 (Ariz. Ct. App. 2010). In that case, the appellant corporation owned and operated a resort as well as a neighboring building. *Id.* at 962. During an expansion project, part of the neighboring building collapsed, causing the state to shut down the main entry to the resort's casino, the west tower of the resort's hotel, and the resort's bus terminal and parking garage. *Id.* While the resort "itself did not sustain any physical damage from the collapse and remained fully operational," it did experience a "decrease in patronage" following the collapse. *Id.* at 962–63. The corporation's insurance policy protected against "loss resulting directly from necessary interruption of business, whether total or partial." *Id.* at 963. Thus, the insurance company argued that the Policy did not cover the corporation's "loss of revenue due to decreased patronage at the [resort] following the collapse" because it was not a necessary interruption of business. *Id.* at 965. But the Court disagreed. It reasoned that just because the

12

resort's "facilities remained operational d[id] not . . . mean that its 'business' ha[d] not been interrupted" such that coverage under the policy was triggered. *Id*. at 970–71.

*Aztar* is factually distinct. The collapse of the neighboring building caused the state to shut down the street with the main entrance to the resort and to several other amenities. *Id*. at 962. So it became physically impossible for guests and patrons to enter the resort through its main entrance. Likewise, they were unable to access the resort's parking garage or bus terminal and prevented from staying in the west tower of the resort's hotel. By contrast, here Buddy does not allege the fire damage affected any patron's ability to access, enter, or otherwise utilize the businesses that operated out of the other three undamaged units. Indeed, the tenants claimed they stopped paying rent because of the strip mall's "physical condition and appearance following the fire," not because patrons could not access their storefronts or park in their parking lots. (ECF No. 18, PageID.414.)

Next, Buddy's reliance on *Del Monte Fresh Produce, N.A., Inc. v. Ace Insurance Co.*, No. 00-4792, 2002 WL 34702174 (S.D. Fla. Oct. 3, 2002), is equally inapposite. There, a hurricane ravaged the plaintiff produce company's plantation in Guatemala. As part of the damage, the plantation's "flood control infrastructure" gave way, allowing water to destroy several of the plaintiff's banana plants. *Id*. at *3. So the plaintiff filed a claim with the defendant insurance company to recover for its reduced banana yield. Its insurance policy covered "loss resulting from the necessary interruption of business caused by physical damage to the property" from the

13

hurricane. *Id.* at *2. The issue, however, was that while the flood control infrastructure was covered property under the policy, the banana plants were not. *Id.* at *4. Thus, in deciding the scope of the policy's coverage, the court's concern was not whether there was a "necessary interruption of business" but whether the necessary interruption was caused by physical damage to covered property. Ultimately, the court found that "but for the damage to the Plantation's flood control infrastructure, the banana plants would have been able to produce bananas as before" and "[t]he fact that the ultimate loss was in the form of diminished banana crops, property which itself is not Covered Property, does not alter this result." *Id.* at *6.

But that analysis has no bearing on this case. Indeed, it is not the case that "but for the damage to [the two damaged units], the [three undamaged units] would have been [tenantable] as before"—the three undamaged units were tenantable both before and after the fire. *Id.* Put differently, the fire damage to the two units covered by the Policy did not somehow render the three undamaged units untenantable— the fire damage to two units did not cause fire damage to the other three units.

Last, Buddy relies on *Studley Box & Lumber Co. v. National Fire Insurance Co.*, 154 A. 337 (N.H. 1931). There, a fire in a stable harmed some horses that were used in the operation of a sawmill. *Id.* at 338. Without the horses, the sawmill was unable to continue its operations. *Id.* The court found that the saw mill could recover for its loss of income due to the suspension, reasoning that "a fire loss on any of the units of the plant affects the business in its entirety . . . . The units are mutually dependent, and, if one fails, the others ordinarily suffer." *Id.* But here, the individual

14

tenant units, which are home to individual businesses (*see* ECF No. 18-3, PageID.442 ("Commercial Rent Roll")), are not mutually dependent. Damage to one does not necessarily damage the others.

It is also worth noting that Buddy's interpretation of the Policy leads to unreasonable results. *See Samuels v. Aetna Life Ins. Co.,* 211 N.W.2d 104, 106 (Mich. App. 1973) ("In order not to lead to unreasonable results . . . the construction [of a contract] must . . . be fair, natural, reasonable, logical, and practical, having reference to the risk and subject matter and the purposes of the entire contract.") (internal citation omitted). For instance, under its interpretation, if a fire damaged only part of a single unit in Building 1, and a tenant residing in Building 2 chose to stop paying Buddy rent, the Policy would cover its loss in rental income from that non-compliant tenant. That result cannot possibly "honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994) ("The primary goal in the construction or interpretation of any contract is to honor the intent of the parties."). It would mean holding Selective "liable for a risk that it did not assume," *Matthews v. Harleysville Ins. Co.*, 826 F. App'x 508, 512 (6th Cir. 2020) (quoting *Jervis Webb Co. v. Everest Nat'l Ins. Co.*, 650 N.W.2d 722, 725 (Mich. Ct. App. 2002), but that Buddy, as a property owner, did—namely the risk that a tenant might withhold rent for reasons not attributable to direct property damage.

15

**IV.**

Accordingly, because Buddy cannot recover loss of income from tenant spaces that were not damaged by the fire, the Court GRANTS Selective's motion for partial summary judgment (ECF No. 14).

SO ORDERED.

Dated: January 16, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE